Ms. Bowenhead? Appearing pro bono, correct? Yes. In case I forget later, the court thanks you for your pro bono representation. Thank you, Your Honor. Will you reserve any time for rebuttal? Yes, please. Two minutes. Very well. Thank you. If I could, I just want to ask you about the pro bono representation. Sometimes we don't see that at first glance on the papers. How were you appointed pro bono in this case? We took the case on referral from a legal services organization. Okay. And had you notified the Third Circuit that you were pro bono when you filed? I don't believe so, Your Honor. Okay. Because if you did, on pro bono cases we get a notification that this is pro bono, and we like to express our gratitude for attorneys who devote their time to helping us in cases like this. The reason we picked it up is my law clerk noticed the law firm and said this doesn't appear to be a private representation, and it might be helpful if you could notify the clerk when you file a pro bono case. We like to express our appreciation by granting you argument and then, you know, putting you through the ringer here. Okay. And why don't we – I'm going to ask Ms. Ayala to restart the clock. Thank you anyway. Well, thank you. However you got here, we thank you. Well, thank you. I apologize for not notifying the court sooner. No, no. No, it's just for the benefit of increasing the likelihood of argument, and so the court knew. Okay. So may it please the Court, my name is Michelle Movahead. I represent Petitioner Augustino Smith. The court should reverse the Board's decision to deny cat relief to Mr. Smith for at least two reasons, because the denial is based on incorrect formulations of the legal standard and because it rests on the Board's failure to properly review the immigration judge's decision. Both of these are legal issues that the court has jurisdiction to consider under 8 U.S.C. 1252. Turning first to the legal standards, the immigration judge applied the wrong legal analysis to both the 2002 beating Mr. Smith suffered and to the likelihood of future torture. As to the 2002 beating, the IJ concluded that because the people who beat Mr. Smith were not themselves government actors, the beating could not rise to the level of torture as a matter of law. That is not the correct legal standard. The immigration judge was required also to consider whether the evidence demonstrated the government of Jamaica acquiesced to this type of private actor violence. The immigration judge's failure to consider that is an error of law that merits reversal, and he reached the legal conclusion that the 2002 beating did not constitute torture on the basis of an incomplete formulation of law that he then carried over into assessing the likelihood that Mr. Smith would be tortured if he is removed to Jamaica. It's important to note that the immigration judge accepted all of Mr. Smith's evidence, deemed him completely credible, and explicitly relied on both Mr. Smith's written declaration and his oral testimony in making findings about this 2002 beating, including his findings that the men who beat Mr. Smith did so while using derogatory slurs. The board, for its part, failed to pick up on this legal error. The decision of the board contains no discussion of the immigration judge's analysis of the beating in 2002, and it contains no analysis of whether that beating rose to the level of torture as a matter of law. So either the board adopted the immigration judge's application of the wrong legal standard, or the board failed to carry out its legal obligation to review the IJ's conclusions de novo. Either way, the denial of cat relief to Mr. Smith rests on the basis of a misapplication of law. As to the likelihood that Mr. Smith would be subject to torture if he is removed to Jamaica, the immigration judge again committed legal error. Under Kaplan, the immigration judge was required to make findings about what is likely to happen, as a matter of fact, and then to analyze whether that rises to the level of torture as a matter of law. The immigration judge did not make those findings. Instead, he turned right to a misapplication of the law. He analyzed only whether the government would torture Mr. Smith, and he did so holding as a matter of law that he could not consider the Jamaican laws that provide for imprisonment and fines as a consequence for same-sex sexual conduct. This is completely wrong. This court has squarely held that punishment pursuant to the law can still be considered torture if it defeats the object and purpose of the Convention Against Torture. The immigration judge should have at least engaged with that legal precedent, and his failure to do so is error. Ms. Mulvahead, you've been talking about what the IJ didn't do. Can you tell us what the IJ did do? And I'll throw one thing out there for you to perhaps start with, which is the IJ found that based on improved country conditions, it was not likely for the government to acquiesce in any future torture of Smith. Was that not a finding of the IJ? That was a finding of the IJ. Unfortunately, it rested on a failure to give due consideration to all of the record evidence, including, for example, a letter that Mr. Smith submitted from his mother detailing specific threats to his life. Well, the IJ, I don't remember if it's a he or she, but the IJ did specifically advert to that letter at page 54 of the appendix, correct? Yes, when he admitted it into evidence. Yes. So, I mean. Yes. He acknowledged that it existed. He admitted it into evidence. He did not, however, consider the likelihood that those threats would be carried out. He didn't consider the possibility that, again, Mr. Smith would be beaten and harmed by private actors while police officers stood by. Well, it just seems like you're fighting against our case law that we've said on multiple occasions that the IJ doesn't have to recapitulate every piece of evidence. Isn't that the law? That is the law, Your Honor. And we, I guess you could say assume, or we take the record on the basis, giving credit to the fact finder, that they actually did consider the evidence of record unless there's something, a red flag that tells us otherwise. Yes, and those red flags are present. And what exactly, what's the red flag that tells us that when the judge admitted that letter from the mother that the judge didn't consider that as part of the record? So, he didn't discuss it in the oral decision at all. But there are other indicators of the immigration judge failing to give due consideration to the evidence. So, for example, he spends quite a bit of time talking about the 2014 State Department report, but he misquotes that report in two different respects. He misquotes it as to the number of Jamaican laws that were not being enforced, and he misquotes it with respect to the State Department's finding that police, the police force in Jamaica on the whole fails to investigate or punish, let alone prevent private acts of violence against people who are or are perceived to be gay. And frankly, Your Honor, this is where the board's job is so important. The board was required to look at the factual findings of the immigration judge and review them for clear error. There's no indication that the board did so. In fact, the board's decision explicitly says that there's an absence of evidence that anyone is likely to torture Mr. Smith if he's removed to Jamaica. So, what specific evidence are you saying that the board overlooked? I believe, well, so the board, the quote concerning the lack of specific threats to Mr. Smith's life specifically overlooks the letter from Mr. Smith's mother. It's directly contrary to her, to the contents of that letter. In addition, the board considered only, the board simply dismissed out of hand most of Mr. Smith's documentary evidence. He didn't consider whether the newspaper articles, whether the report from two different human rights bodies, in addition to the State Department report, demonstrated a pattern of gross, flagrant, and mass violations of human rights. He simply said, contrary to this Court's holding in P.S. Chacón-Vallegas, that general country conditions information is never sufficient to demonstrate a likelihood of future torture. So, that was both a failure to grapple with the record and a misstatement of the law. Failure to grappling with the record, is that part of our jurisdiction? I guess it's, there's a fine line between where failing to grapple with the record blends into applying the wrong legal standard, I guess. Yes, Your Honor. Since the regulation explicitly requires the fact finders to consider all evidence in the record pointing towards the likelihood of torture, it is a legal question whether the board and the immigration judge complied with that obligation. Well, but again, to challenge you on that, I'm not sure you've shown us where they failed to evaluate all evidence of record, except to tell us that in the oral decision, some pieces of evidence were not referenced. Is there something more explicit than that, or is it an error by omission? As to the likelihood of future torture, it's an error by omission. And this Court, I mean, this Court has required the immigration judges and the Board of Immigration Appeals to provide enough evidence for the Court to review whether, in fact, they've given due consideration to all the evidence. I mean, there's language to that effect in P.S. Chacón-Vallegas, among many other cases. Aren't you really just challenging the immigration judge's interpretation of the facts? We are not challenging the immigration judge's interpretation of the facts, but rather the immigration judge's incorrect analysis of those facts under governing legal precedent. But aren't questions about whether the government will acquiesce? Those are fact findings, are they not? They are, and that's why in Kaplan, this Court explains, ultimately the question of a future likelihood of torture is a mixed question of fact and law, which is why it's so important to separate out the first question, the factual question. What is likely to happen to the petitioner, to the immigrant, if he's removed to the country he fears? And the fact finding here was he's not likely to be tortured because Jamaica has made improvements in the last decade-plus in terms of treatment of LGBT persons, right? That finding was made, right? It would be unusual for this Court to uphold that as a finding under Kaplan, among other things because it's not a finding specific to Mr. Smith. It fails to consider, for example, the likelihood that Mr. Smith would actually be prosecuted under the laws on the books. There are no findings about that. There are no findings about whether the threats to Mr. Smith's life would actually be- Well, the fact finding, as I understand it, was made at a higher level of generality, namely not likely that the government would acquiesce. So the oral decision simply says, repeatedly, that the immigration judge believed he could not find as a matter of law that the government of Jamaica is torturing LGBT people. There is some language around acquiescence, but those are not the conclusions that the immigration judge discussed. For its part, the Board of Immigration Appeals failed to review those fact findings and the legal conclusion that may have flown from it. Not only because the Board failed to discuss at all any of the immigration judge's legal conclusions or fact findings, but also because the Board added legal error, particularly in terms of the chain of events analysis in which it engaged. So the Board concluded that it was unlikely Mr. Smith would be subjected to future torture because it was unlikely that the Jamaican government would become aware of his sexual conduct. This is just completely wrong as well. Further, it fails to account for the argument Mr. Smith actually raised, which is that he would be harmed by private actors with governmental acquiescence. This is the error that the Board committed in Roy and this court reversed as a result. If the Board had intended to analyze the likelihood that Mr. Smith would be subjected to the anti-gay laws on the books, which the government now argues, the correct question would have been whether it is more likely than not that he would be prosecuted under those laws and not whether the government would find out about his sexual activity. Well, if the government generally is no longer prosecuting under those laws, why would we conclude that Mr. Smith would be prosecuted? Respectfully, Your Honor, that is a question that the Board or the immigration judge should have considered as a matter of fact. Neither did. So there are no findings in the record about the frequency with which people are prosecuted under the laws. I thought you just criticized the Board or IJ for making that finding, that they're not prosecuting it presently. So the immigration judge cherry-picked from the evidence to conclude that none of the laws are being enforced. That's actually contrary to what the documentary evidence demonstrates, including the newspaper articles that Mr. Smith submitted and the actual text of the State Department's report from 2014. But isn't that a critique of the IJ's fact-finding based upon the evidence of record? Yes, Your Honor, but I'm trying to persuade this court to look at it as a question of what the Board should have picked up on had it carried out its clear error review. The Board was required to look at each of the immigration judge's factual findings and consider whether they were supported by all of the evidence in the record. There's no particularly on an issue of this significance. There should have been some discussion in the Board's decision, and there is none. About whether they're prosecuting these crimes? About the frequency with which people who are perceived to be gay are prosecuted by the Jamaican government. And so your argument is there's no mention of that in the BIA, even though it was mentioned in the IJ? That's correct. Even though you are arguing that the IJ made a determination that was contrary to the State Department report and to the newspaper clippings entered into evidence? Yes, Your Honor. Does that mean, then, that the BIA has to recapitulate every piece of evidence? I mean, that seems to run into that same problem I identified earlier. Yes, Your Honor. What this Court has said repeatedly in Piazza Chacon, in Roy, and in other cases, is that the Board has to provide enough information about its reasoning to help this Court understand how it reached the conclusions it did. The Board's decision has very, very little analysis. There is a series of conclusory assertions on various legal issues strung together. Thank you. Mr. Ramnitz? May it please the Court, Your Honors, Tim Ramnitz on behalf of the United States Attorney General. This immigration case, Petitioner Augustino Smith, a native and citizen of Jamaica, seeks review of the decision of the agency in his reinstatement proceedings after being previously removed as an aggravated felon, denying his claim for deferral of removal under the Convention Against Torture, finding he failed to establish that the Jamaican government would acquiesce to his torture on account of him being a bisexual. The Board and the immigration judge made two findings in this case, rejecting his claim. One, that his past instance of mistreatment in 2002 did not rise to the level of torture. Second, that the background evidence not otherwise established a clear probability that the Jamaican government acquiesces to the torture of homosexuals. Starting with the first incident, this incident at the taxi stand, Petitioner described it in his declaration and testimony. Once he was removed to Jamaica, he went to a taxi stand shortly three weeks after he was removed about, and he saw, when he got there, a police jeep. This is in his reasonable fear interview. And then he has a conversation with a man, and the man starts talking about America, and says, I don't support the gay movement in America, or something to that effect. They got in a fight because he believed Petitioner to be homosexual, and at one point a crowd gathered and someone knocked him unconscious. We're familiar with the facts. And the officers stood by and did nothing. That's the allegation. That's the allegation, and if I could walk the court through how that claim evolved. So we know what happened in the parking lot or the taxi stand, but what happened with the police I don't think supports what Petitioner is trying to frame it as. So starting with his reasonable fear interview, he states that he saw a police jeep at the taxi stand when he got there. He doesn't say he saw police officers. Then when he gets to his declaration in front of the immigration judge, he states that he saw a police car when he first got to the taxi stand, fortified car lengths away from where he was, and now he saw police outside the police car patrolling for illegal taxis. In his testimony, he states that police were there, but they didn't do anything. Now between all of these, you don't have any statement that the police actually witnessed what happened. And also in his asylum application, he similarly repeats the idea that, he states, when I first got to the taxi stand, I saw police there. But he never actually states in his testimony and declaration that police witnessed the fight, that they acknowledged what was happening and turned their backs on it. Is there any evidence in the record to, assuming police were there at the time of the fight, to educate the police as to the reason for the fight? Can you repeat that question? Sure. Is there any evidence of record to indicate why the fight was occurring, assuming that there were police on the scene? In other words, you know, two guys drunk, two guys, friends who were mad at each other, or in this case, a man who is being beaten because of his sexual orientation. Yes, on the record, petitioners state that the fight occurred because of homophobia. Right. That the individual who attacked him said you're one of them, presumably meaning you were homosexual. Right. Yeah, but what about the police involvement in that? Is there any evidence to connect that discriminatory rationale for the beating with the knowledge of the police? No, there's not. There was anti-gay epithets thrown at the petitioner. According to the declaration, when the crowd crowded, they yelled things like, baddie boy, and other slurs against him. There was no evidence that the police overheard these slurs. Again, according to this declaration, it's a silent application, the police were four to five car lengths away patrolling for legal taxis. There's nothing in there showing that the police were watching the fight, much less they overheard these slurs, and that's the reason why they failed to intervene. All right, so is it your argument then that that incident did not rise to the level of torture, that that finding by the IJ was correct because there was no government involvement or because the beating was insufficient to rise to the level of torture, or both? Both. The definition of torture is two parts. And what did the IJ say, though, right? Because, you know, under Chenery, we can't help the IJ out. Did the IJ speak to that? The IJ spoke to the first definition explicitly, saying this does not rise to the level of torture, which is defined as the intentional infliction of severe harm or suffering. And an example Fishner cited in his brief to the board challenging whether or not this was torture was a case called El Seguro in the Ninth Circuit where someone was detained for weeks on end. They were beaten every three to four hours with electrical cords. This is a fight at a taxi stand. I don't think there's a compelling reason why that constitutes torture. There's no case law that would find a fight to rise to the level of torture, and that's what the IJ specifically says. And the IJ says nothing about whether there were police on the scene or not? That ambiguity that you just raised, the IJ is silent on that? The IJ has not referenced that in his opinion. All right, so then that can't really help you under Chenery, right? We can't look to that to affirm the IJ, the board. Well, it's us trying to walk the court through how the claims evolved, because I don't think that was really put before the immigration judge, this idea that the police were looking on, they turned their backs because of slurs. He said in his declaration that when he got there, there was police there patrolling for taxis, but he never asserted to the immigration judge that police were there witnessing the fight and they turned their backs on him. So that's why it's not referenced. It's kind of evolved as more briefing has occurred. So the second part of this case is one that the background evidence shows a clear probability that the Jamaican government acquiesces to the torture of homosexual individuals. And there's been a lot of background evidence submitted in this case, but even Petitioner's documents show that the conditions have changed, that the police no longer acquiesce, if they ever did, to the torture of homosexuals. Starting with the first two media articles Petitioner submitted, one of them even says specifically that the police are taking steps to combat homophobic violence. Then DHS responded by submitting the State Department report, which notes that these old laws exist on the books that punish homosexual acts, but they have not been enforced. What about the letter from Smith's mother? Why shouldn't the BIA have looked at that, taken that into consideration? If you look at the BIA's opinion, it does look at that letter. It doesn't use the exact words, but on the third page of the BIA's opinion, it addresses Petitioner's claim that some evidence is overlooked, and it cites the portions of Petitioner's brief that he submitted to the Board. It cites specifically the pages 4 through 6 and pages 10 of Petitioner's brief to the Board, and that's where he specifically mentions his claim that the IJA failed to consider the letter. The Board says, we don't believe the IJA overlooked any evidence, including the evidence you're referencing in these pages of your brief, and we don't think it will change the result anyway. But even looking at the mother's letter, it never references homosexuality. The letter states that when she returns to Jamaica on occasion, random individuals have approached her and said, because your son is incarcerated, you should buy a black dress. It never mentions homosexuality or Petitioner's bisexuality. It says only his incarceration. The reference to a black dress is pretty straightforward, isn't it? Yes, that's a death threat for sure. However, there's no reference to why that death threat was issued, only because it was incarceration. That's what the letter reads. It doesn't say we're issuing you a death threat because your son is a bisexual. So the letter does not show a clear probability of torture because he's a homosexual, or any way speak to that. And again, the Board did look at that. It specifically cites these pages of his brief where he talks about overlooking the mother's letter, among other things, including this idea that the police were present at the scene and turned their backs on this fight. But there's further background evidence. In every document you look at that Petitioner submitted, for example, the Human Rights Watch Report from 2014, it states that, yes, some crimes go unprosecuted. It also states that the Jamaican police have now established protocols for addressing hate crimes, including those against homosexuals. It also says that police have taken steps to combat homophobic violence. That's one of Petitioner's documents. Otherwise, they also have the 2013 JFLAG Report, which is a LGBT advocacy group for Jamaicans. That report similarly states that Jamaican police have taken steps to allow for safe reporting of hate crimes against homosexuals. Meanwhile, you have the State Department report similarly stating that the police are taking steps to resolve and prevent instances of abuse against homosexuals. And DHS also submitted media articles which showed Jamaica recently had a successful Pride Week in August 2015, attended by the mayor of Kingston. And then, this is not in the record, but a quick Google search shows you that they had another successful Pride Week this last August. Conditions have vastly changed, and even looking at the torture that Petitioner claimed to experience, which the agency said was not torture, that was in 2002. Fast forward many years later, conditions have vastly improved in Jamaica. Let's see if the panel has any other questions. Thank you, Mr. Ramnitz. We'll hear Ms. Movahead on rebuttal. So, the government is now making a series of involved factual arguments that are so important you would have expected to see them in the immigration judge's decision. The immigration judge does not discuss any of the reports that Mr. Ramnitz just discussed, and clearly that evidence was so important because there was enough dispute about, there's enough ambiguity that there should have been clear factual findings on the part of the immigration judge before he analyzed whether or not what was likely to happen to Mr. Smith would rise to the level of torture. As to the 2002 beating, Mr. Smith, so first of all, Mr. Smith specifically discussed, specifically testified about police officers being present at the scene of the beating and not intervening. That's at page 89 of Mr. Smith's appendix. It carries over onto page 90. Mr. Smith is not required to show that the police officers specifically knew that he was being beaten because he was perceived as gay, nor does he have to show that the police officers heard it, because the intent burden, it has to do with the people who are causing the harm. The point of the willful blindness. Well, but acquiescence is involved, right? I mean, because the torture has to be on account of. So, yes, Your Honor, but this is the point of willful blindness. The petitioners don't have to show that the government deliberately decides not to intervene. It's enough to show that they had the opportunity, they knew they had the burden, and they didn't intervene. Right, but I thought the intervention, and you're saying the intervention, the decision not to intervene doesn't need to be based on a protected ground? No, Your Honor. I think Mr. Smith is not required to show the police officers' intent. I think it's enough for somebody to show that there's a pattern of private actor anti-gay violence with non-intervention by the police. If there just aren't enough police in a country, and private citizens are torturing other private citizens, you're saying that's enough for acquiescence? Yes, Your Honor, this Court has said it's enough. Okay. But there was, I gather, information that the police were there with another specific job that they were doing. Do we know that they were even aware the fight was going on? Your Honor, the immigration judge said that he accepted all of Mr. Smith's testimony, including Mr. Smith's testimony and written declaration concerning the fact that police officers could not have missed the fact that a beating was going on. So I don't think his burden extends beyond that testimony that the immigration judge deemed fully credible. I think the immigration judge should also have considered carefully, in light of the documentary evidence, whether there was sufficient evidence that police routinely failed to intervene to protect people who are subject to anti-gay violence to make a finding of willful blindness. Do you have any other cases that indicate, let's say, similar facts? We've referred to it as a beating. The torture threshold is a high one. Do you have other cases you can cite to us where the facts are similar in terms of the mistreatment suffered by the petitioner? There's nothing. I'm not aware. There are cat cases, not asylum or withholding cases. Right. I'm not aware of cases in this circuit that are squarely on point with respect to the facts. Or any other circuits? I would be happy to submit a letter on that. We didn't. I haven't seen any, so I'm not suggesting they're out there. I think the Bromfield decision from the Ninth Circuit is instructive. But I think also, if you step outside a little bit and look at, say, P.H. Jacon-Villegas, which does present a different set of facts, but somewhat similar. I mean, there were past threats to the petitioner's life. And then he submitted copious record evidence of the likelihood of future torture in the form of country conditions evidence that this Court held to be sufficient to show a likelihood of torture, and thus to qualify him for cat relief. And was there a finding of past torture in that case? I believe there was not, Your Honor, but I'd be happy to check it again. We can look at it. Okay. Thank you, Ms. Mowat. And, again, the Court thanks you for your pro bono representation and appreciates the excellent argument of both counsel. It was very helpful. We'll take the matter under advisement.